Argued January 13, reversed February 10, petition for
rehearing denied March 1, 1960

# EVANS *v.* GENERAL STEAMSHIP COR-
PORATION ET AL

349 P. 2d 269

*John C. Beatty,* Portland, argued the cause for appellant Repp. On the brief were Dusenbery, Martin, Schwab, Beatty & Parks, Portland.

*Nicholas Granet,* Portland, argued the cause and filed the brief for respondent.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER and DUNCAN, Justices.

ROSSMAN, J.

This is an appeal by the defendant, John H. Repp, from a judgment which the circuit court entered against him in favor of the plaintiff in the sum of $7,500 after a jury had returned its verdict in that amount for the plaintiff. There were two other defendants when the complaint was filed. One of them, Andreas Zervakis, was not served with the complaint or the summons and he made no appearance. The defendant General Steamship Corporation, Ltd., made a motion for an involuntary non-suit at the close of the plaintiff's case which the trial judge sustained. The order which sustained it is not challenged. The plaintiff, a Portland motorcycle police officer, incurred personal injury when the door of a taxi cab, operated by the defendant Repp, was opened by the aforementioned Zervakis at the moment when the cab had come to a stop and the plaintiff was undertaking to pass it. The opened door struck the plaintiff and caused him to fall to the pavement.

The defendant-appellant Repp submits eight assignments of error. The first of them follows:

"The Court erred in failing to direct a verdict and in denying the motion for judgment notwithstanding the verdict."

The quoted language is succeeded by excerpts from the trial transcript which show the basis of the motion. All of the testimony came from witnesses called by the plaintiff. The contention, as stated in the appellant's brief, which underlies the motion, is the following:

"The Respondent failed to prove that negli-

gence of the Appellant Repp in any particular charged proximately caused the accident."

We will now state the essence of the evidence produced by the plaintiff-respondent.

August 16, 1956, at about 1:10 p.m. the defendant, John H. Repp, was operating a cab southerly on Southwest Broadway, a public thoroughfare of the city of Portland, between Salmon and Madison Streets. Southwest Broadway lies north and south and is a five lane street. It is a one-way thoroughfare and traffic moves upon it in a southerly direction only. Its most easterly and westerly lanes are devoted to parked automobiles. The other three lanes are for traffic.

Upon the occasion which brought injury to the plaintiff the taxi cab driven by the defendant Repp was proceeding southerly on Broadway with the Broadway entrance of the federal courthouse as its destination. The entrance is between Main and Madison Streets on the east side of Broadway. The cab was operating in the most easterly traffic lane. To its left there was the lane occupied by parked automobiles. The cab had two passengers. One of them, James E. McGraw, was in the front seat to the right of the driver Repp. The other passenger, the aforementioned Zervakis, was in the rear seat. The cab's speed was 12 to 20 miles per hour.

About a block or a block and a half north of the Broadway entrance to the federal courthouse the plaintiff and a fellow motorcycle officer by the name of Wallace Misfelt fell in behind the cab as it was proceeding southerly. Their destination was beyond the federal courthouse. The plaintiff testified that his position, as he was following the cab, "was right directly behind the taxi cab. * * * The middle of

the cab." Misfelt was to his right. The plaintiff swore that he and Misfelt were following the cab at a distance of "I would say about two car lengths perhaps. * * * I'd say twenty-five to thirty feet * * *." When the cab drew alongside of the Broadway entrance of the courthouse it came to a stop. It was then in the same lane in which it had been operating, that is, in the east traffic lane immediately adjacent to the one occupied by parked automobiles.

According to the plaintiff and Misfelt, the cab gave no signal of its intention to stop except so far as intention to stop was announced by the red light in the rear of the cab which was automatically illuminated when the cab's brakes were applied. The plaintiff acknowledged that he saw the red light. The following is quoted from his testimony: "I had no trouble in stopping behind the cab, no." When he stopped he was a car's length behind the cab. He had observed, prior to that, that there was no traffic in front of the cab and had inferred from that fact that the red light signal given by the brake light signified that the cab intended to stop.

When the cab stopped Misfelt, who, as we have said, was to the plaintiff's right, kept on going but shortly, upon hearing the sound of a crash, looked back and saw the plaintiff lying upon the pavement. He then returned to the plaintiff.

The plaintiff, in describing the stop which he made to the rear of the cab, employed the following language:

"* * * to the best of my knowledge I either completely stopped or I stopped so slow that I had to put my foot down. * * *"

At that point he shifted the gears of his motorcycle

and, according to his further testimony, "looked over my right shoulder and pulled around the cab." When he was to the right of the cab Zervakis opened the cab's right rear door and thereupon it came into contact with the plaintiff's left leg. The plaintiff was thrown to the pavement thereby sustaining the injuries which underlie this action. It is clear that the plaintiff's action in driving to the right and seeking to pass the cab was not necessitated by any sudden stop upon the part of the cab. We have mentioned the fact that the motorcycle came to a halt a car's length behind the cab. After having so testified, the plaintiff continued:

"Q So your proceeding on around it was purely voluntary, isn't that right?
"A Oh, yes, yes."

As we have seen, Zervakis, who was seated in the rear seat of the cab, left it by its right rear door. Why he chose the right rear door as his means of departure is not indicated by any of the evidence. No one mentioned how much space was available between the right of the car parked next to the curb and the left side of the cab. Misfelt, who was a witness for the plaintiff, testified that he did not know how much space was available between those two vehicles. McGraw, who likewise was called to the stand by the plaintiff, swore that he did not pay any attention to the space between the parked automobile and the cab. John J. Jarvis, a member of the Portland Police Department who investigates accidents, came upon the scene of this one a few minutes after it had occurred. He testified that the space between the east curbstone of Broadway and the place where he found the debris which was cast by the accident was 18 feet. There is nothing in the record which

indicates how far the parked car was from the curb-stone nor the widths of the parked car and the cab.

The evidence indicates that all of the space between Main and Madison Streets on Broadway available for the parking of automobiles was occupied. The only area that was unoccupied was a short space which the witnesses termed "Mail Zone." Misfelt testified that no parking was permitted in that zone. His testimony is unchallenged.

McGraw, whom we have said was called to the witness stand by the plaintiff, testified that the cab stopped in the normal manner and that as it was coming to a stop he proceeded to turn himself around so as to ascertain whether he could depart from the cab in safety from its right front door. According to him, he heard a crash the moment he began to turn. The following is taken from his testimony:

"Q There was an impact of some kind there. Did you hear a noise shortly after you were stopped?

"A Yes.

"Q And how much time do you estimate elapsed after you stopped that you heard this impact or noise of something happening to the back of the cab?

"A Well, it was practically instantaneous. The cab had just barely come to a stop and I had just started to turn around. I hadn't even turned around yet to see whether there was anything coming. I had just started just when the motorcycle hit the cab door, the back door of the cab.

&ast; &ast; &ast;

"Q Now as a matter of fact as the cab stopped you turned to look to see if it was safe to get out, did you not?

"A Yes.

"Q And by the time you turned, Zervakis had already opened the rear door.

"A Yes.

"Q As a matter of fact, he opened the rear door just at the instant the cab stopped, did he not?

"A. Yes he did.

"Q Before you or Mr. Repp, the driver, had a chance to say anything?

"A That's right.

\*           \*           \*

"Q So that I get it straight, the cab came to a stop in a normal manner, and just at the instant the cab came to a stop, Zervakis opened the door?

"A Yes.

\*           \*           \*

"Q Nobody had a chance to say anything, is that correct?

"A That's correct.

"Q And Repp had not even opened his door yet?

"A No.

\*           \*           \*

"Q How far was it opened?

"A To the best of my knowledge I would say it was half way open."

The plaintiff testified that when the cab came to a stop he saw "no movement inside the cab at all." Then, according to him, he shifted gears, resumed the operation of the motorcycle, and

"I turned and pulled out around, to move into the other lane and go around the cab."

The next development was described by him as follows:

"And I caught a flash of the door opening and hitting me in the leg, and the next thing I knew I was laying in the street."

Some time after the accident he measured the width of the door of the taxi cab and finding that it was three feet broad reasoned that the door which struck him must have been opened to the extent of two and a half or three feet. We quote again from his testimony:

"Q   Mr. Evans, as I understand it, you came to a momentary stop behind the cab after it had double parked.

"A   That's correct.

\*          \*          \*

"Q   I said it all happened in just an instant. The cab stopped, you stopped, you swung out, and bing, is that about right?

"A   If an instant means in the time it takes me to change gears and swing out and travel about fifteen or twenty feet, I would say instant, yes."

An ordinance of the City of Portland reads as follows:

"It shall be unlawful for the driver of a vehicle to stop, stand, or park such vehicle, whether attended or unattended, except when necessary to avoid conflict with other traffic or in compliance with the directions of a police officer or traffic control signal, in any of the following places: \*  \*  \*  Subsec. No. 11—On the roadway side of any vehicle stopped or parked at the edge or curb of a street or highway,"

The complaint gives the following specifications of its general charge of negligence:

1. Bringing the cab to a sudden stop in a driving lane without giving warning of intention to stop.

2. Failure to maintain a proper lookout.

3. Permitting a passenger to open the door of the cab without first determining that the movement could be made in safety.

4. Failing to warn the plaintiff that the door was about to be opened.

5. Parking the cab so close to other parked vehicles so that the passenger could not leave the cab through its left doors.

In enumerating the specifications we omitted one which the trial judge withdrew from the consideration of the jury. There is no claim that the trial judge erred in so doing.

██ Although the plaintiff's brief makes extensive reference to the ordinance which is quoted in a preceding paragraph, we do not believe that the ordinance has any bearing upon this case. First, we think that the ordinance was not intended to prevent accidents that occur in the manner depicted above. Its purpose is, according to our belief, to facilitate the movement of traffic. Next, as the plaintiff freely concedes, the stopping of the cab in the traffic lane did not prevent him from stopping his motorcycle with ease and at a safe distance behind the cab. We have quoted from his testimony in which he stated that his act in turning to the right of the cab was not due to any sudden stop upon its part. His turn to the right, as he acknowledged, was voluntary upon his part and was done in order to continue his course. We are satisfied that the ordinance has no bearing upon the issues of this case. If Repp's act in stopping the cab in the traffic lane was a violation of the ordinance, the violation was not the proximate cause of the plaintiff's injury. It was nothing more than an attendant condition.

██ No statute or ordinance has been called to our attention which prohibits the operator of a taxi cab or other vehicle from permitting a passenger to depart from it into a traffic lane. That being true,

Repp's duty to Zervakis and the plaintiff was governed by the standards of due care. The evidence does not show that there was not sufficient space between the car which stood at the curb to the left of the cab and the latter to have permitted Zervakis to depart from the left rear door of the cab. If there was not sufficient space, it was the duty of the plaintiff to have presented evidence to that effect. In the absence of evidence of that character we must assume that Repp was obedient to the demands of due care and stopped in such a manner that Zervakis could have departed from the left rear door of the cab. The defendant Repp was not bound to have anticipated, in the absence of some indication to the contrary, that Zervakis would attempt to alight from the cab into the traffic lane. Further, the evidence indicates that Zervakis' opening of the right hand door of the cab was almost simultaneous with the stopping of the cab. In fact, McGraw's testimony indicates that Zervakis opened the door before Repp had a chance to utter anything. The plaintiff's testimony did not materially modify McGraw's.

■ We think that the legal princples which govern the issues are set forth in *Krieger v. Oreste,* 218 Or 256, 344 P2d 541, and *Canada v. Royce,* 199 Or 196, 257 P2d 624. Their application to the issues before us demands a conclusion that the circuit court erred when it failed to sustain the motion of the defendant Repp for a directed verdict.

The first assignment of error is sustained. The judgment of the circuit court is reversed.

DUNCAN, J., concurs in the result.